IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

STEVEN FOSHEY,

                Plaintiff,                                   OPINION AND ORDER

    v.

                                                 19-cv-434-slc

CITY OF ELLSWORTH POLICE OFFICER
SGT. DARREN EKHOLM, *et al.*,

                Defendants.

---

In this civil action brought under 42 U.S.C. § 1983, plaintiff Steven Foshey alleges that Village of Ellsworth police officers Darren Ekholm and Chase McKahan and Pierce County sheriff's deputy Tara Wentlandt violated his Fourth Amendment rights by stopping, detaining, and searching him without reasonable suspicion, by arresting him without any reasonable belief that he had committed a crime or met the requirements for emergency detention, and by using excessive force. Before the court is Foshey's motion for partial summary judgment as to the lawfulness of defendant Ekholm's seizure of Foshey during the initial vehicle stop, roadside detention, and custodial arrest under Wisconsin's community caretaker doctrine.[1] Dkt. 30. Specifically, Foshey argues that Ekholm's asserted defense of qualified immunity fails as a matter of law. For the reasons stated below, I find that Ekholm is entitled to qualified immunity with respect to the stop, detention, and arrest of Foshey and I am dismissing Foshey's claims of unlawful seizure on that ground.

---

[1] The motion does not appear to include Foshey's claims that Ekholm unreasonably performed two preliminary breath tests on Foshey or searched Foshey's pockets without his consent, or any of the claims against defendants McKahan and Wentlandt.

From the parties' proposed findings of fact, the video footage from the body camera worn by Ekholm during the incident in question (*see* dkt. 33, ¶ 5),[2] and the transcript of the video (Tr., dkt. 29), I find the following facts to be material and undisputed unless otherwise noted. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (court should view facts in light depicted by videotape).

## UNDISPUTED FACTS

### I. Background and the Parties

Plaintiff Steven Foshey is a 29-year old resident of Wisconsin Rapids, Wisconsin. At the time of the events at issue in this case, Foshey was experiencing symptoms of undiagnosed schizophrenia.

Defendant Sgt. Darren Ekholm is a law enforcement officer employed by the Village of Ellsworth, and he was acting within the scope of his employment during all of his interactions with Foshey in July 2015. At the time of the events in question, Ekholm was an officer with 15 years experience and was the only sergeant in the Ellsworth Police Department.

### II. Dispatch and Traffic Stop

At approximately 7:10 p.m. on July 12, 2015, Ekholm was dispatched to the Holiday Gas Station, which is located about one block from the Ellsworth Police Department on Main Street, which is also designated as State Highway 10 and 63. Dispatch told Ekholm that "[m]ale states

---

[2] Following the parties' lead, my citations to the body camera video (BCV) refer to the time stamp at the top of the video. The time stamp on the video is one hour earlier than the actual time.

he is suicidal and is hearing voices.[3]  He is parked at pump #2."  Ekholm testified at a motion hearing on December 13, 2016 that he understood this to be a report about a suspicious individual who had spent a significant amount of time in his car in the parking lot at the gas station.  Ekholm did not have a description of the individual or his vehicle or any other information about what the individual said.

Ekholm drove his squad car from the police station to the gas station, and upon arrival, saw a few cars:  a blue Pontiac Bonneville turning left onto Main Street off of one of the side exit roads, and a pickup truck leaving the southeast corner of the parking lot.  The driver in the pickup truck made eye contact with Ekholm and pointed to the Bonneville.  At 7:18 p.m., Ekholm stopped the blue Bonneville leaving the scene in order to determine if the driver was the individual about whom the call was made.  Ekholm stopped the vehicle to conduct a welfare check.  He did not suspect that the driver had committed any crime at the time of the stop.

### III.  Roadside Interaction with Foshey (7:18 p.m. to 9:10 p.m.)

Rather than approaching the car, Ekholm directed the driver, who turned out to be Foshey, to exit the vehicle by opening his driver's side door from outside the window.  However, Foshey opened the door from the inside.  Ekholm directed Foshey to put his hands up and walk backwards, but after taking two steps, Foshey turned and walked face forward toward Ekholm. Ekholm had Foshey sit down on the curb as he tried to obtain more information from him.  *See*

---

[3] As discussed further below, Ekholm later learned from a gas station employee that there was no information suggesting that Foshey was suicidal or had made suicidal statements.

BCV 18:19-18:20.  Ekholm observed that Foshey appeared to be in a very emotional state, which confirmed that Foshey was the individual about whom the gas station had made a report.

Ekholm began asking Foshey questions while Foshey was sitting on the curb.  Foshey denied having any weapons.  Foshey did not have any obvious physical injury, but he was leaning into the side of his head.  (The video shows that Foshey was touching the right side of his head with his raised right hand.  BCV 18:20:12-18:20:49.)  When Ekholm asked what was going on, Foshey responded that he did not know, he did not understand, he was having trouble thinking, and he did not know where he was.  *See* BCV 18:20:20-18:21:15; Tr. 4.  In response to Ekholm's question about when his trouble thinking started, Foshey said that he thought he was diabetic but had not been diagnosed with diabetes and did not take any medications. Foshey did not know if he was supposed to take medications.  BCV 18:21:20-51; Tr. 5.

Around this time, defendant Tara Wentlandt arrived on scene and asked Foshey if he had been drinking.  Foshey said that he had, but not a lot.  Tr. 5-6; BCV 18:21:51-18:22:14.  Foshey told Ekholm that he lived in Wisconsin Rapids with his grandfather, had no family in the Ellsworth area, and had stayed alone in a hotel in Osseo the night before.  BCV 18:22:14-18:23:20, 18:53:03–18:53:27; Tr. 6-7, 20.  He did not visit anyone during his drive from Wisconsin Rapids.

When Ekholm asked Foshey whether he was hearing voices, Foshey responded that "I'm not . . . [*pause*] hearing voices . . . I'm just [*pause* ] I need a doctor.  And I don't know how to get help, but I will when I get home."  Tr. 7-8; BCV 18:24:06-18:24:25.  In response to Ekholm asking whether he could be more specific, Foshey stated only that he needed to see a doctor and did not elaborate as to what kind of doctor when asked.  Ekholm then asked Foshey several

different questions about whether he wanted to hurt himself or was contemplating suicide, and Foshey either answered no or shook his head "no" in response to every question. Tr. 10. The video shows that Foshey paused before answering some of Ekholm's questions about hurting himself and he answered most of the questions quietly. BCV 18:25:43-18:27:08. Foshey denied being in pain and said "I don't know if diabetes is doing this, I just need somewhere to go." Tr. 10-11; BCV 18:27:00-18:27:30. The video shows that Foshey paused and was labored in providing his response. *Id.*

At 7:27 p.m., Wentlandt asked Foshey about his identification, and Foshey said it was in the car. Foshey stood, reached into his pocket, and walked hesitantly toward the passenger side of his car. Wentlandt told Foshey to sit down, and Foshey said "okay" and sat down on the retaining wall. Ekholm then asked Foshey why he was talking to someone at the gas station about suicide. Foshey said that he wasn't. Ekholm asked Wentlandt, and then Foshey, if his wallet was in the car. As Wentlandt went toward Foshey's car, Foshey got up to follow her in an apparent attempt to retrieve the wallet, but he sat back down when Ekholm told him to. Ekholm wanted Foshey to sit down because he was not walking well and Ekholm did not want Foshey to fall into Main Street or get hurt. Wentlandt retrieved Foshey's license, which was on the front seat of the car, not inside a wallet. BCV 18:27:34-18:29:21; Tr. at 11-12. No one asked Foshey's permission to enter his vehicle.

By 7:34 p.m., Ekholm learned from the Wisconsin Rapids Police Department that Foshey had been subject to three separate welfare checks since April 30, 2015, but none of them had resulted in Chapter 51 detention actions. At about 7:35 p.m., about 20 minutes into the stop,

Ekholm tried to call Foshey's father and grandfather. He also stated that he was going to check with the complainant from the gas station to get more information.[4] Tr. 12.

Based on Foshey's confused behavior, Ekholm suspected that Foshey was under the influence of intoxicants. There also was a bottle of alcohol on the front seat of Foshey's car that had been consumed at some point. At 7:46 p.m., Ekholm administered two preliminary breath tests (PBTs) by having Foshey blow into a handheld device. Foshey registered a .03 on the first test and a .00 on the second. BCV 18:46:00-18:46:25; Tr. 13.

Around this time, a third officer arrived on scene. Ekholm told Foshey that he had learned from a gas station employee (not the employee who had called the police) that Foshey had spent over an hour sitting at the pumps before coming inside and saying that he was hearing some voices. In response, Foshey told Ekholm that he was "feeling diabetic" recently and that he had not seen a doctor because he could not afford one. Tr. 14-15; BCV 18:47:22-18:48:18. He also told Ekholm at some point that he had been sitting at the gas station pumps trying to figure out if he had enough money for gas.

Ekholm sat on the retaining wall next to Foshey to try to engage him in conversation. He asked Foshey several questions about what he was feeling, how long he had felt that way, and whether he suicidal or was hearing voices. Tr. at 14-19; BCV 18:49:55-18:50:37. Foshey denied saying that he was hearing voices. Although Foshey seemed like he was going to respond at one point, his voice trailed off and he became quiet before stating "just wait for the ambulance." Tr.

---

[4] Holiday gas station employee Jerri Pabts made the initial 911 call on behalf of her co-worker, Joseph Allan Nelson, who had witnessed Foshey's behavior. When Ekholm called the gas station, he initially spoke with Pabts who handed the phone to Nelson. Nelson explained that the individual (Foshey) sat at pump #3 for about 45 minutes before coming into the store to buy a pastry. When Nelson asked Foshey if he was alright, Foshey responded that he was in pain and hearing voices. Nelson did not hear Foshey say anything about suicide or feeling suicidal.

17. Ekholm told Foshey that he had not called an ambulance because he did not think there was a reason to call one at that time and that Foshey needed to answer his questions honestly so that Ekholm could try to get him some help, at least temporarily. *Id.* at 16-17.

Ekholm asked Foshey various questions about where he was from, what he did for work and whether something had happened to him recently. Foshey responded with brief answers. He said that his mother lives in Arizona and he had talked with her earlier that day about getting a ride back to Wisconsin Rapids. Tr. 22. When Ekholm asked Foshey about the past welfare checks conducted by the Wisconsin Rapids officers, Foshey explained that his mother had called the police because she thought he was suicidal. Tr. 22-23; BCV 18:55:51-18:56:36.

When Ekholm told Foshey that he sensed something was going on with him, Foshey said that he had been thinking and driving around. Ekholm asked if Foshey would tell someone if he was thinking of hurting himself, and Foshey said yes, but when Ekholm asked who he would tell, Foshey paused and then said he didn't know. He also said that he would tell someone but that he was not feeling that way. Tr. 23-25; BCV 18:56:53-18:57:52.

Foshey said that while he was driving, he was thinking about moving to Steven's Point, but he was having a trouble finding a place. Foshey denied having children and told Ekholm that he hesitated in answering the question because he was thinking about other things. Foshey then said he did not know why he was sitting there, and Ekholm told him it was because he had told him to and that he was on a "fishing expedition" to try and help him. Foshey denied having problems with his grandfather or father and said that he lived in a camper at his father's place. Foshey said that if was allowed to leave, he would get some gas and go home. Tr. 25-28. BCV 18:57:51-19:01.

7

At 8:02 p.m., Ekholm said that per procedure, he was going to run the situation by a mental health facility.  Tr. 29.  As Ekholm was explaining this to Foshey, he received a return call from Foshey's grandfather, Charles Foshey.  Tr. 29-30; BCV 19:02:04-19:03:37.[5]  Charles told Ekholm that Foshey had been acting very strangely lately, had mentioned hearing voices, had moved out of his father's home and into a camper because he thought the home was "bugged," and had left the Wisconsin Rapids area after an incident with his father's girlfriend and children on July 11, 2015.  According to Charles, Foshey received a call from someone in the Ellsworth area and left immediately afterwards without telling anyone where he was going.  Charles had been concerned about Foshey's mental well-being for some time and had wondered whether he was using drugs.

Ekholm also spoke with Foshey's father, Steven Joel Foshey, who also stated that Foshey had been acting strangely for the last couple of months.  Foshey had told his father one night that there were people outside at the camper who were going to kill him.  When his father asked where the people were, Foshey said that they were hiding in the woods.  Steven Joel also reported to Ekholm that Foshey's mother had called earlier in the day to report that she had received a call from Foshey, during which he said that he was trying to figure out how to kill himself and that he could not figure out how.  However, Foshey had not expressed suicidal threats or intentions to his father.

Now that he had information from the family, Ekholm resumed his questioning of Foshey at 8:21 p.m., asking him about his depression, thoughts of suicide, and a disagreement that he

---

[5] Ekholm apparently turned off the body camera at 8:03 p.m., while he was speaking with Charles Foshey.  He turned it back on at about 8:21 p.m.

had with his father about sleeping arrangements on July 10, 2015.  Foshey responded to most of the questions quietly by saying "yeah" or "right" and agreed that he had been feeling depressed about living in a camper.  BCV 19:21-19:26; Tr. 31-36.  Ekholm told Foshey that he was "not really necessarily buying into some of the answers that you've given me" and "I think there's a little bit more to it and you're reluctant to say it."  Tr. 37; BCV 19:26:25-19:26:36.  Foshey said that he had eaten[6] and now felt fine.  Tr. 37.

Ekholm did not believe that Foshey met the criteria for an emergency detention.  But because Ekholm was not able to identify what was going on with Foshey and because he continued to have concerns about Foshey's health and allowing him to operate a vehicle, he contacted Northwest Connections and spoke with a woman named Mackenzie at 8:27 p.m.  BCV 19:27:00-19:28:02; Tr. 37-38.  Mackenzie did not think that there was enough at that point for Foshey to be brought to a mental health facility or to hold him on an emergency detention.  She asked Ekholm about a possible safety plan, and Ekholm responded that it would be difficult because Foshey did not have family in the area.[7]  Mackenzie contacted Charles Foshey and then called Ekholm back to suggest that a mobile crisis worker conduct an in-person assessment of Foshey.

## IV.  Handcuffing and Transport to Police Station

Around 9:10 p.m., the officers decided to transport Foshey to the police station for an in-person assessment.  BCV 20:10-20:12; Tr. 38-40.  Ekholm told Foshey that he had spoken

---

[6] Earlier in the interview, Foshey stated that he had a doughnut at the gas station.

[7] Ellsworth is about 150 miles from Wisconsin Rapids.

9

with his grandfather and father, who were concerned about him, and that he needed to speak with his mother.  He also told Foshey that he would be taking him to the police department to meet with a mobile crisis worker and would see where to go from there.  Foshey said "I really don't think that's necessary," but Ekholm stated that he was taking him into custody because there were concerns and conflicting stories.  Tr. 40.  Foshey said "ok" and asked "for what reason?"  Tr. 41; BCV 20:12-20:13.  Ekholm told him it was for his personal safety.  Foshey told Ekholm that "I don't really want to do that," to which Ekholm replied, "Well, I know you don't really want to, but I'm not going to give you a choice at this point.  Okay?  So that's - - that's what we're going to do.  Okay?"  Tr. 42; BCV 20:13:38-20:14:20.  Ekholm asked him to stand up to be handcuffed.  Foshey said "that doesn't make sense" and "I need to drive . . . home."  Tr. 43.  Ekholm informed Foshey that he was being taken into custody to the police station, and would then either be released, taken to a mental health hospital, or be released with a safety plan.  Tr. at 43-44.  Foshey stated "that's illegal," expressed agitation, and said that he did not have to be placed in handcuffs for that.  Ekholm explained that when he gets into the squad car, he has to be cuffed.[8]  Ekholm told Foshey that he was being taken to Ekholm's office and not the jail, and that the cuffs would be removed when they arrived.  Ekholm then made clear that if Foshey did not stand up and cooperate with the handcuffs, he would force them on, stating "This is the last opportunity that I'm going to just give you to stand up for me.  Otherwise we're going to stand you up and put the cuffs on you behind your back."  *See* BCV 20:14:20–20:17:20; Tr. 44-45.

---

[8] The Ellsworth Police Department's Use of Restraints policy informs officers that "all persons placed in protective custody or under arrest shall be properly handcuffed during transportation, except in the case of cooperative, non-threatening persons, where such decision shall be at the Officer's discretion."

Foshey stood up in a cooperative manner but continued to question the need for handcuffs and say that this did not make sense to him.  Ekholm handcuffed Foshey's arms in the front and did a pat down search.  Without asking for permission, Ekholm reached into Foshey's pockets and pulled out personal items such as coins, cigarettes, and a lighter before returning the coins and cigarettes to Foshey's pocket.  Ekholm kept the lighter.  Foshey said "This – this – this is like I'm under arrest right now," and Ekholm responded that he was not under arrest but being temporarily detained for evaluation of mental health.  Foshey physically complied with Ekholm and the other officers, but he made it abundantly clear that he did not want to go with them and stated that he thought what Ekholm was doing was illegal.  *See* BCV 20:17:24–20:20:30; Tr. 46-50.

Ekholm placed Foshey in the back of the squad car and left him there while he took a phone call for a few minutes.  Foshey stated "You said you would take these [handcuffs] off," to which Ekholm responded that he would take them off when they got to his office.  BCV 20:20:30–20:21; Tr. 50.  Foshey became agitated and started to hit his head against the cage divider between the front and back seats.  Ekholm then took Foshey to the police department three blocks away, almost two hours after the initial stop.

## V.  Ekholm's Training

In 2011 or 2012, Ekholm attended Crisis Intervention Training (CIT) offered by the Minnesota CIT Officers' Association.  One of the CIT training objectives was to "[i]ncrease awareness of suicide risk for person struggling with mental illness."  Slides from the training conveyed the following information to the attendees:

11

- Depression, confusion, hopelessness, and evasive behavior can be elements of mental illness and that psychiatric symptoms may be checked easily by orientation, judgment, reasoning, and memory questions.

- "De-escalation Hints for Schizophrenia" include "directive communication" and "assertive verbal directions" for severe cases.  Dkt. 44-5 at 7.

- "Command presence and a 'take charge' attitude does not often work with the mentally ill individual in crisis – This attitude can actually inflame the situation and cause the mentally ill individual in crisis to escalate his/her behavior."  Dkt. 33-3 at 3.

- "An officer's voice may not be the only one that the mentally ill person is hearing. . . .  Command presence may appear to be aggressive to the mentally ill person in crisis."  *Id.*

- "Paranoia in the form of <u>fear</u> + <u>suspiciousness</u> becomes a factor.  Finally, if we add in anxiety, the mentally ill person in crisis can quickly escalate his/her negative behavior when faced with the standard operating procedure of a police officer who has been trained to deal with criminals and victims, and with situations that are out of control."  *Id.* at 4.

- Avoid restraints if possible because handcuffs were likely to cause a "catastrophic reaction," and if restraints are necessary to ensure the safety of officers or others, "use all caution to prevent injury."  Dkt. 33-3 at 6.

- "[R]esist using a loud, authoritative tone…do whatever you can to look non-threatening – lean against a car, sit down, move away from possible exits, take off hat/sunglasses, squat/kneel to be at eye level so they are not at eye level with your gun belt."  *Id.* at 5.


# ANALYSIS

## I.  Summary Judgment Standard

Summary judgment is appropriate if the moving party–in this case Foshey–shows there is no genuine dispute as to any material fact and he is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  If Foshey meets this burden, then Ekholm must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment.

*Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-407 (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted).  The burden of each party to a summary judgment motion depends on whether that party will bear the burden of proof at trial.  Here, it will be Foshey's burden to prove the elements of his claims against Elkhorn, so to succeed at summary judgment, Foshey must establish that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law on the merits.  Fed. R. Civ. P. 56(c).  Any doubt as to the existence of a genuine issue must be resolved against the moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *Lawrence v. Kenosha County*, 391 F.3d 837, 841 (7th Cir. 2004).

## II.  Qualified Immunity

Foshey's motion for summary judgment is based on his contention that Ekholm is not entitled to qualified immunity, which protects government officials from damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (quoting *Estate of Clark v. Walker*, 865 F.3d 544, 549-50 (7th Cir. 2017)).  The inquiry is two-fold:  "(1) whether the facts, taken in the light most favorable to the plaintiff[], show that the defendant[] violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Gonzales v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009).

Whether a right was "clearly established" is grounded in the notion of fair notice.  Thus, "[a] rule is too general if the lawfulness of the officer's conduct 'does not follow immediately

13

from the conclusion that [the rule] was firmly established.'" *District of Columbia v. Wesby*, __ U.S. __, 138 S. Ct. 577, 590 (2018) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). The Court of Appeals for the Seventh Circuit recently reminded courts that "clearly established law cannot be framed at a 'high level of generality.'" *Campbell*, 936 F.3d at 545 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Rather, "[e]xisting caselaw must dictate the resolution of the parties' dispute," meaning that the "precedent must have placed the . . . constitutional question beyond debate." *Id.* Accordingly, courts must "[f]rame the constitutional right in terms granular enough to provide fair notice." *Id.* This demanding standard protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

## III.  Community Caretaker Doctrine

Ekholm argues that his initial stop, subsequent detention on the side of the road, and eventual arrest of Foshey was justified under Wisconsin's community caretaker doctrine, which allows police officers to engage in certain community caretaking functions, unrelated to criminal law enforcement, to protect members of the public. *See Cady v. Dombrowski*, 413 U.S. 433, 441 (1973) (warrantless search of automobile in police custody did not violate Fourth Amendment because search was performed for safety reasons and not to detect or investigate criminal activity); *Long v. United States*, 847 F.3d 916, 921 (7th Cir. 2017) (officer performing caretaking function when he instructed driver who had been asleep at wheel to open door of car that was impeding traffic in restaurant drive-through lane).

State and federal courts are divided over the scope of the community caretaker doctrine. The Court of Appeals for the Seventh Circuit has limited the doctrine to warrantless searches of automobiles. *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 553-54 (7th Cir. 2014)[9]. However, Wisconsin courts have interpreted the community caretaker doctrine more broadly, including applying the doctrine to justify certain seizures and warrantless entries into and searches of the home when the police had reason to believe that the occupant might be injured or otherwise in danger. *Id.* at 573; *see also State v. Pinkard*, 2010 WI 81, ¶ 28, 327 Wis. 2d 346, 363, 785 N.W.2d 592, 601 (officers' warrantless entry and sweep of dwelling in response to report suggesting that occupants were unconscious—possibly as result of drug abuse—was legitimate caretaking function); *In re Kelsey, C.R.*, 2001 WI 54, 243 Wis. 2d 422, 626 N.W.2d 777 (officers' seizure of teenage girl who appeared to be potential runaway was legitimate community caretaker action). For the purposes of qualified immunity, the Seventh Circuit has held that "Wisconsin cases are [] as relevant as our own precedents in evaluating what a [Wisconsin] police officer might have thought the law permitted in responding to a report that [an individual] was in danger of harming herself." *Sutterfield*, 751 F.3d at 573. *See also Stanton v. Sims*, 571 U.S. 3, 5 (2013) (per curiam) (considering both federal and state decisions in determining whether it was clearly established that police officers' warrantless entry into home while in hot pursuit was contrary to Fourth Amendment).

Wisconsin applies a three-step test to determine whether an officer's conduct properly falls within the scope of the community caretaker exception to the Fourth Amendment's warrant

---

[9] In *United States v. Procknow*, 784 F.3d 421, 428 n.5 (7th Cir. 2015), when confronted with an abandoned puppy, the court mused in *dicta* that there might other circumstances covered by the doctrine, but the court acknowledged the limits set in *Sutterfield*.

requirement. *Pinkard*, 2010 WI 81, ¶ 29; *State v. Kramer*, 2009 WI 14, ¶ 21, 315 Wis. 2d 414, 427, 759 N.W.2d 598, 605. First, the court considers whether a seizure or search within the meaning of the Fourth Amendment has occurred. *Id.* Although defendants do not expressly concede the issue, there is no dispute that Ekholm seized Foshey when he stopped his car, detained him on the side of the road and placed him in handcuffs to bring him to the police station for an interview. *Terry v. Ohio*, 392 U.S. 1, 16 (1968) ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."); *Kelsey*, 2001 WI 54, ¶¶ 35, 39 ("[T]o effect a seizure, an officer must make a show of authority, and the citizen must actually yield to that show of authority," and "[a]n investigative detention is a seizure.").

Second, the court must determine whether the police conduct was bona fide community caretaking activity, such as the protection of a person. *Pinkard*, 2010 WI 81, ¶ 29; *Kramer*, 2009 WI 14, ¶ 21. In evaluating this component, courts examine the totality of the circumstances to determine whether there is an objectively reasonable basis to believe that the plaintiff was in need of assistance. *State v. Blatterman*, 2015 WI 46, ¶ 44, 362 Wis. 2d 138, 169, 864 N.W.2d 26, 40. To be a bona fide community caretaker function, the officers must be acting on sufficiently reliable evidence. *Pinkard,* 2010 WI 81, ¶ 36 ("The anonymous call 'exhibited sufficient indicia of reliability to justify' concern for the health and safety of the occupants of Pinkard's residence and warranted further investigation.").

Third, the court weighs the public need and interest in acting on that concern against the degree and nature of the intrusion on the privacy of the individual. *Kramer,* 2009 WI 14, ¶ 21. In balancing these interests, the court considers four factors: (1) the degree of the public interest

and the exigency of the situation; (2) the attendant circumstances surrounding the search, including time, location, the degree of overt authority and force displayed; (3) whether an automobile is involved; and (4) the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished. *Id.* at ¶ 41; *Pinkard*, 2010 WI 81, ¶ 42.

For the purpose of deciding Foshey's motion for summary judgment, the court must determine whether Foshey has shown that, in light of Wisconsin precedent existing at the time, Ekholm was "plainly incompetent" in pulling Foshey over, ordering Foshey to exit his vehicle and sit while he questioned him for almost two hours about whether he was at risk for suicide, and then handcuffing Foshey, placing him in the back of a squad car, and bringing him to the police station to speak with a mobile crisis worker against Foshey's wishes. Foshey has not met this burden. Foshey has not pointed to any clearly established law that prohibited Ekholm from acting as a community caretaker and seizing Foshey under the totality of circumstances confronting him. To the contrary, the undisputed facts show that a reasonable officer could have believed that such actions were justified under Wisconsin's broad interpretation of the community caretaker doctrine. I will address each of Ekholm's actions separately.


## IV. Vehicle Stop

Foshey argues that Ekholm was not acting in a bona fide caretaker function when he stopped Foshey and ordered him out of the car because Ekholm had no objective or specific basis for believing that Foshey in particular was the subject of the gas station employee's call. He points out that Ekholm did not have a description of the individual or the car and that an unknown driver can point to another unknown driver for a variety of reasons. Citing the

17

reasonable suspicion standard for investigative stops, which requires an officer to have a particularized and objective basis for suspecting that the person stopped is or will be engaged in criminal activity, *see United States v. Adair*, 925 F.3d 931, 935 (7th Cir. 2019) (citing *Terry*, 392 U.S. at 21-22), Foshey contends that Ekholm stopped his vehicle and ordered him out of the car based on nothing more than a hunch that Foshey needed assistance.  Foshey argues that the unidentified pickup truck driver's vague pointing gesture may have engendered suspicion in Ekholm's mind, but not *reasonable* suspicion that the driver of the blue Bonneville in particular needed help.  *See Sutterfield*, 751 F.3d at 566-67 (although officer averred weight and feel of CD case was consistent with gun being inside, "that at most was very good guess" because it "could have contained almost anything"); *U.S. v. Paniaqua-Garcia,* 813 F.3d 1013, 1014 (7th Cir. 2016) (officer's observation of driver holding cell phone provided only suspicion, not reasonable suspicion, that driver was violating no-texting law because "officer hadn't seen any texting; what he had seen was consistent with any one of a number of lawful uses of cellphones").  Foshey also suggests that the unidentified driver is akin to an unreliable anonymous tipster.  *See Florida v. J.L.*, 529 U.S. 266, 270 (2000) (anonymous tips must exhibit "sufficient indicia of reliability" to provide reasonable suspicion for investigatory stop); *Alabama v. White*, 496 U.S. 325, 329 (1990) ("[A]n anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.").

Although Foshey's argument may have some traction in a criminal law context, it is undisputed that the sole purpose of Ekholm's stop was a welfare check, not the investigation of any criminal activity or even a traffic violation.  Wisconsin courts have found that it is well within the bounds of an officer's reasonable community caretaking activities to stop and detain

18

individuals who appear in need of assistance.  In *Kramer*, 2009 WI 14, ¶ 37, the state supreme court found that an officer had an objectively reasonable basis for deciding that a motorist may have been in need of assistance when he stopped behind a car parked on the side of a highway with its hazard flashers operating and asked the driver if he could help him with something.  In *Kelsey*, 2001 WI 54 at ¶¶ 4-5, 36, the court found that officers were performing a legitimate caretaking function regarding a potential runaway when they  stopped to question a girl sitting in a huddled position with her hood up over her head against a storefront in high-crime neighborhood and told her to stay put.  In fact, as mentioned above, Wisconsin courts have gone as far as to hold that warrantless entry and search of a home to ensure the safety of the occupants and property is a legitimate community caretaker function.  *See State v. Horngren*, 2000 WI App 177, 238 Wis. 2d 347, 617 N.W.2d 508 (officers' warrantless entry and search of home after receiving information about a suicide threat was a legitimate community caretaker action); *Mason v. Green Cty.*, 2020 WL 1531634, at *7 (W.D. Wis. Mar. 31, 2020) (recognizing Wisconsin courts have applied community caretaking doctrine to situations in which officers entered home to check on health and well-being of people inside).

Foshey cites a few cases in which courts have refused to apply the community caretaker doctrine because there is not sufficient evidence that a particular person is in need of assistance. *See, e.g.*, *State v. Jennerjohn*, 2019 WI App. 58, ¶ 27, 389 Wis. 2d 104, 936 N.W.2d 404 (unpublished) (fact that officers could not rule out the possibility that someone was still in home containing unsecured firearms and in need of assistance after suspect had been taken into custody did not permit officers to enter home to ensure safety); *State v. Kettlewell*, 2019 WI App 58, ¶ 20, 389 Wis. 2d 104, 936 N.W.2d 401 (no objectively reasonable basis to believe

Kettlewell needed immediate assistance at time officer conducted warrantless search of his home because Kettlewell had walked away from one-car accident with no apparent damage or resulting injury); *Mason*, 2020 WL 1531634, at *7 ("[D]efendants had no reason to believe that plaintiff or anyone inside his home needed medical assistance of protection."). However, in each of those cases, there was no reasons for the officers to believe that anyone was in need of assistance because the danger had passed. Here, the undisputed facts also show that immediately prior to Ekholm's stop of Foshey's vehicle: (1) dispatch had told Ekholm that a male parked at a gas pump had stated that he was suicidal and hearing voices; (2) Ekholm understood that the report was about a suspicious individual who had spent a significant amount of time in his car in the parking lot at the gas station; and (3) when Ekholm arrived at the gas station, the driver of a pickup truck leaving the parking lot made eye contact with Ekholm and pointed to a blue Bonneville about to leave the parking lot. Given the information provided to Ekholm and the observations he made after arriving on scene, a reasonable Wisconsin officer would have thought that Wisconsin's community caretaking doctrine permitted, or at least did not prohibit, him from stopping the blue Bonneville to ensure that the driver was not at risk for suicide or in need of assistance.

Foshey argues that on balance, the public interest and exigency in ensuring his safety did not outweigh the stop's intrusion on his rights, particularly because Ekholm could have followed his car to look for impaired driving or asked the gas station clerk or dispatch for a better description of the person or car before stopping him. However, as Ekholm points out, Foshey was in a car and had already left the gas station, meaning that he would not be as readily stoppable had Ekholm waited to gather further information. At that point Ekholm was

considering that a possibly disturbed or unstable individual was operating a vehicle on a state highway.

In light of existing precedent, a reasonable officer in Ekholm's situation could have believed he was reasonably exercising a community caretaker function in stopping Foshey, and that is all that matters for qualified immunity. Therefore, Ekholm is entitled to qualified immunity from liability for allegedly violating his Fourth Amendment rights by stopping Foshey's vehicle without reasonable suspicion.

## V. Roadside Detention and Arrest

Foshey contends that even if the initial stop had been authorized by an objective reasonable suspicion that Foshey needed assistance, that suspicion evaporated shortly after the stop. He points out that about 20 minutes into the stop, Ekholm spoke with the gas station clerk who clarified that he had reported being worried about a person hearing voices and seeming like he needed help, but the clerk stated that the person had not expressed any suicidal ideation or intent. Foshey also points out that he repeatedly denied any suicidal ideation, instead requesting a doctor for what he suspected were symptoms of diabetes. He argues that the stop lasted way longer than necessary to determine whether he needed assistance. *See Rodriguez v. United States*, 575 U.S. 348, 354 (2015) ("[D]uration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' – to address the traffic violation that warranted the stop, and attend to related safety concerns.").

Although Foshey continuously denied hearing voices or having thoughts of suicide, the reason for the investigatory stop had not yet evaporated as Foshey claims. The body camera

video shows that Foshey vacillated between being evasive, hesitant, unsure, or quiet in response to Ekholm's questions. At various points in his conversation with Ekholm, Foshey stated that he did not know what was going on, he did not understand, he was having trouble thinking, and he did not know where he was. In addition, Ekholm learned 20 minutes into the stop that Foshey had been subject to three separate welfare checks since April 30, 2015, and after talking with Foshey for another 15 to 20 minutes, Elkhom learned that Foshey's mother had requested the welfare checks because he had expressed thoughts of suicide to her. Also around this time (beginning at 8:02 p.m.), Ekholm talked to Foshey's father and grandfather, who said that Foshey had been acting strangely, was hearing voices, and thought that people were after him. Even Foshey admits that there was "self-reported and observable information that he was experiencing some sort of physical or mental illness or a combination" of the two. Dkt. 31 at 19. Foshey also told Ekholm that he intended to drive home once he was let go.

If Ekholm had let Foshey go, then Foshey potentially would have put himself or others at risk on the road. *Sutterfield*, 751 F.3d at 551 (police play important role "in safeguarding individuals from dangers posed to themselves and others"). As the circumstances unfolded in this case, a reasonable officer could have concluded that Foshey's continued detention was necessary, or at least not prohibited, by Wisconsin's community caretaker doctrine. *See Minett v. Overwachter*, 433 F. Supp. 3d 1084, 1095-96 (W.D. Wis. 2020) (officer who detained plaintiff and administered breathalyzer test to assess need for medical attention entitled to qualified immunity under community caretaker doctrine); *Pinkard*, 2010 WI 81, ¶ 52, 327 Wis.2d 346, 785 N.W.2d 592 (community caretaker doctrine permits police to take action to ensure safety of individuals whom police perceive reasonably as unable to "look after their own interests").

Foshey argues that Ekholm should have called an ambulance instead of holding him for two hours and then handcuffing him and bringing him to the police station.[10]  However, even though Foshey talked about "feeling diabetic" and needing a doctor, he could not explain what was physically wrong with him, did not exhibit any obvious signs of physical distress or pain, and denied being in pain.  In addition, after sitting on the retaining wall for about an hour, Foshey stated that he was feeling physically better because he had eaten a pastry at the gas station. Therefore, a reasonable officer could believe that Foshey needed assistance but that an ambulance was not necessary at that point.

After gathering more information from Foshey's family members and questioning Foshey further, Ekholm still was not able to put a finger on what was going on with Foshey.  Because Ekholm continued to have concerns about Foshey's health and allowing him to operate a vehicle, he contacted a mental health worker, who stated that there was not yet enough information to hold Foshey on an emergency detention.  With Foshey's nearest family members over 150 miles away, the mental health worker recommended that a mobile crisis worker conduct an in-person assessment of Foshey.  Ekholm decided to transport Foshey to the police station for this assessment.

Foshey argues that it was an unreasonable exercise of the community caretaker doctrine for Ekholm to handcuff him and place him in the back of a squad car to go to the police station. However, the undisputed facts show that Ekholm told Foshey that he was concerned for his

---

[10] Foshey also argues that Ekholm unreasonably denied him medical care, citing the deliberate indifference standard under the Eighth Amendment.  However, Foshey did not allege an Eighth Amendment denial of medical care claim in his amended complaint, so I have not considered this argument.

safety, and that after getting to the police station, he would either be released, taken to a mental health hospital, or be released with a safety plan.  Ekholm also explained that it was department procedure to handcuff everyone riding in the squad car.  On the body camera video, it is clear that Ekholm and the other officers remained calm and spent several minutes encouraging Foshey to be handcuffed in front without the use of force.

Given Foshey's confused demeanor and unclear answers to the officers' questions, along with the reports that Ekholm had received from Foshey's family members about him acting strangely, hearing voices, and having paranoid thoughts, a reasonable officer could have perceived Foshey as being a safety risk, both to himself and the officers, permitting the officer to conclude that handcuffing Foshey was appropriate.  A reasonable officer also could have concluded that placing Foshey in a squad car for a trip to the police station to speak with a mobile crisis worker would stabilize the situation and provide a safer environment to conduct a mental health assessment.  *See Cibulka v. City of Madison*, 2020 WL 1332997, at *11 (W.D. Wis. Mar. 23, 2020) (finding same with respect to officers who took intoxicated individual not suspected of a crime to ground, handcuffed him, and attempted to put him in a squad car); *Blatterman*, 2015 WI 46, ¶ 44 (objectively reasonable for officer to handcuff Blatterman and transport him to hospital against his will where Blatterman reportedly tried to blow up his home by filling it with gas, previously had discussed suicide by cop, exhibited erratic and disorientated behavior, complained of chest pain, and wore insufficient clothing for cold weather).  *See also United States v. Eatman*, 942 F.3d 344, 348 (7th Cir. 2019) (court refused to substitute its judgment for police officers' legitimate concerns in deciding to handcuff defendant as reasonable

means to effectuate investigatory stop after responding to domestic dispute, finding handgun, and observing defendant yelling and pounding on tenant's door).

Accordingly, Ekholm also is entitled to qualified immunity from liability for allegedly violating Foshey's Fourth Amendment rights by detaining him on the roadside, placing him in handcuffs, and transporting him to the police station for an in person psychological assessment.


**ORDER**

IT IS ORDERED that plaintiff Steven Foshey's motion for partial summary judgment with respect to defendant Darren Ekholm's affirmative defense of qualified immunity, dkt. 30, is DENIED.  Plaintiff's claims that defendant Darren Ekholm unreasonably seized him in violation of the Fourth Amendment will be DISMISSED on the grounds of qualified immunity.


Entered this 8th day of September, 2020.

BY THE COURT:

/s/

_____
STEPHEN L. CROCKER
Magistrate Judge